MICHAEL R. LOZEAU (State Bar No. 142893)
DOUGLAS J. CHERMAK (State Bar No. 233382)
Lozeau Drury LLP
1516 Oak Street, Suite 216
Alameda, CA 94501
Tel: (510) 749-9102
Fax: (510) 749-9103 (fax)
E-mail: Michael@lozeaudrury.com
          Doug@lozeaudrury.com

ANDREW L. PACKARD (State Bar No. 168690)
Law Offices of Andrew L. Packard
319 Pleasant Street
Petaluma, CA 94952
Tel: (707) 763-7227
Fax: (415) 763-9227
E-mail: andrew@packardlawoffices.com

Attorneys for Plaintiff
CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE

SCOTT W. GORDON (State Bar No. 99716)
Law Offices of Scott W. Gordon
1990 N. California Blvd., Suite 940
Walnut Creek, CA  94596
Tel: (925) 295-3131
Fax: (925) 295-3132
E-mail: swgordon@sbcglobal.net

Attorney for Defendant
SOLANO GARBAGE COMPANY

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation,<br><br>          Plaintiff,<br><br>     vs.<br><br>SOLANO GARBAGE COMPANY, a corporation.<br><br>          Defendant. | Case No. 3:09-cv-00243-SI<br><br>**NOTICE OF SETTLEMENT AND [PROPOSED] ORDER TO EXTEND CASE MANAGEMENT CONFERENCE**<br><br>Judge: Hon. Susan Illston |

PLEASE TAKE NOTICE that the parties have reached a settlement resolving all claims in this action.  A copy of that signed settlement agreement is attached hereto as Exhibit 1.  The settlement is contingent upon the expiration of the federal agency 45-day review period.[1]

PLEASE TAKE FURTHER NOTICE that, in accordance with federal law, no judgment disposing of this action may be entered prior to 45 days following the receipt of the proposed settlement agreement by the United States Department of Justice and the national and Region IX offices of the United States Environmental Protection Agency.  *See* 40 C.F.R. § 135.5 (requiring the parties to provide notice to the court of the 45-day agency review period under 33 U.S.C. § 1365(c)).  Such notice was mailed to the agencies on August 28, 2009.  The regulatory agencies' review period will end by approximately October 20, 2009 (allowing forty-five days for agency review and approximately eight days for mailing time).  If any of the reviewing agencies object to the proposed agreement, the parties would require additional time to meet and confer and attempt to resolve the agencies' concerns.

Given the statutorily mandated 45-day review period, the parties submit that good cause exists to set October 20, 2009, as the date by which a Stipulation for Approval of Settlement Agreement and Dismissal of Plaintiff's Claims or a Notice that the settlement is null and void, must be filed.  Thus, the parties jointly request the further case management conference, currently set for September 25, 2009, be rescheduled to November 6, 2009.

Dated: August 28, 2009                 Respectfully submitted,

LOZEAU DRURY LLP

By:    _*Douglas J. Chermak*_____
       Douglas J. Chermak
       Attorney for Plaintiff
       CALIFORNIA SPORTFISHING PROTECTION ALLIANCE

---

[1] Title 33 of the United States Code, Section 1365(c) provides that "[n]o consent judgment shall entered in an action in which the United States is not a party prior to 45-days following the receipt of a copy of the proposed consent judgment by the Attorney General and the Administrator."

By:    *Scott W. Gordon* (as authorized on 8/28/2009)
Scott W. Gordon
Attorney for Defendant
SOLANO GARBAGE COMPANY


### [PROPOSED] ORDER

IT IS HEREBY ORDERED that the Further Case Management conference in the above action shall be extended to November 6, 2009.  A joint statement bringing the Court up to date shall be due on October 30, 2009.


Dated:   _____, 2009          _____
                                  Judge Susan Illston
                                  United States District Judge

# EXHIBIT 1

## SETTLEMENT AGREEMENT AND MUTUAL RELEASE OF CLAIMS

This Settlement Agreement and Mutual Release of Claims ("AGREEMENT") is entered into between the California Sportfishing Protection Alliance ("CSPA") and Solano Garbage Company ("SGC") (collectively, the "SETTLING PARTIES") with respect to the following facts and objectives:

## RECITALS

**WHEREAS**, CSPA is a 501(c)(3) non-profit, public benefit corporation organized under the laws of the State of California, dedicated to the protection, enhancement, and restoration of the Suisun Slough, Suisun Bay, the San Francisco Bay, and other California waters.  Bill Jennings is the Chairperson of CSPA and a member of CSPA;

**WHEREAS**, SGC is a corporation organized under the laws of the State of California that owns and operates a solid waste and recycling collection operation and a recycling center located at 2901 Industrial Court in Fairfield, California (the "Facility") pursuant to State Water Resources Control Board Water Quality Order No. 97-03-DWQ, National Pollutant Discharge Elimination System General Permit No. CAS000001, Waste Discharge Requirements for Discharges of Storm Water Associated with Industrial Activities Excluding Construction Activities (hereinafter, the "General Permit").  A map of the Facility is attached hereto as Exhibit A and incorporated by reference;

**WHEREAS**, on or about November 7, 2008, CSPA provided SGC with a Notice of Violation and Intent to File Suit ("60-Day Notice Letter") under Section 505 of the Federal Water Pollution Control Act (the "Act" or "Clean Water Act"), 33 U.S.C. § 1365;

**WHEREAS**, on January 20, 2009, CSPA filed its Complaint in the United States District Court for the Northern District of California against SGC (*California Sportfishing Protection Alliance v. Solano Garbage Company,* Case No. 3:09-cv-00243-SI).  A true and correct copy of the Complaint, including the 60-Day Notice Letter, is attached hereto as Exhibit B and incorporated by reference;

1

**WHEREAS**, SGC denies any and all of CSPA's claims in its 60-Day Notice Letter and Complaint;

**WHEREAS**, CSPA and SGC, through their authorized representatives and without either adjudication of CSPA's claims or admission by SGC of any alleged violation or other wrongdoing, have chosen to resolve in full CSPA's allegations in the 60-Day Notice Letter and Complaint through settlement and avoid the cost and uncertainties of further litigation; and

**WHEREAS**, CSPA and SGC have agreed that it is in their mutual interest to enter into this AGREEMENT setting forth the terms and conditions appropriate to resolving CSPA's allegations set forth in the 60-Day Notice Letter and Complaint.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, CSPA and SGC hereby agree as follows:

<u>**EFFECTIVE DATE**</u>

1.      The term "Effective Date," as used in this AGREEMENT, shall mean the last date on which the signature of a party to this AGREEMENT is executed.

<u>**COMMITMENTS OF CSPA**</u>

2.      **Stipulation to Dismiss and [Proposed] Order.**  Within ten (10) calendar days of the expiration of the Agencies' review period specified in Paragraph 19 below, CSPA shall file a Stipulation to Dismiss and [Proposed] Order thereon pursuant to Federal Rule of Civil Procedure 41(a)(2) with the United States District Court for the Northern District of California ("District Court"), with this AGREEMENT attached and incorporated by reference, specifying that CSPA is dismissing all claims in CSPA's Complaint.  Consistent with Paragraphs 25 and 26 herein, the Stipulation to Dismiss and [Proposed] Order shall state that the District Court will maintain jurisdiction through December 14, 2011 for purposes of resolving any disputes between the SETTLING PARTIES with respect to any provision of this AGREEMENT.  If the District Court chooses not to enter the Order, this AGREEMENT shall be null and void.

## COMMITMENTS OF SGC

3.      **Compliance with General Permit.**  SGC agrees to operate the Facility in compliance with the applicable requirements of the General Permit and Clean Water Act.

4.      **Implemented Storm Water Controls**.  SGC shall maintain in good working order all storm water collection and treatment systems currently installed or to be installed pursuant to this AGREEMENT, including but not limited to, existing housekeeping measures.

5.      **Additional Best Management Practices.**  Within THIRTY (30) calendar days after the Effective Date, SGC shall implement the following structural best management practices ("BMPs") to improve the storm water pollution prevention measures at the drop inlets, outfalls, and other industrial areas at the Facility:

a.      SGC shall enhance each Triton filter installed at each drop inlet at the Facility with a new filter that uses mixed media for hydrocarbon and metal removal in a non-pocketed media bag, along with a sediment pre-screen to keep the media bag clear from sediment and other materials for better water filtering.

b.      SGC shall design removable metal or rubber covers for all drop inlets at the Facility to prevent the accumulation of dirt, leaves and other sediment. The covers shall be placed over all drop inlets on or before July 1st at the end of each rainy season, subsequent to appropriate maintenance of the filters described above.  The covers shall be removed prior to the first rain event of the subsequent rainy season.  The covers shall be fitted to prevent such materials from entering the drop inlets and designed such that the covers will remain firmly in place while there is normal activity at the Facility.

c.      SGC shall install two 3" pipes in the channel that runs from the office parking lot along the side of the truck wash pad.  SGC shall then fill this

3

channel to prevent any contamination of the run-off from truck washing activities.

d.      SGC shall monitor its operations in the Vehicle Wash area, clearly marked on Exhibit A.  SGC shall re-train employees with respect to storm water pollution prevention.  SGC shall monitor the area to ensure that steam cleaning activities stay within the wash rack area.

6.      **Increased Housekeeping Measures.**  Within THIRTY (30) days of the EFFECTIVE DATE, SGC shall institute the following accelerated sweeping schedule at the Facility:

a.      During the rainy season, SGC shall use a regenerative sweeper to conduct weekly sweeping of the entire Facility, including the parking lot area, and the parking stalls.  SGC shall conduct additional sweeping as needed prior to any anticipated storm events.

b.      SGC shall include a narrative description of its sweeping program in the Storm Water Pollution Prevention Plan ("SWPPP").  Sweeper operators will be provided with a log sheet attached to a clip board which will be maintained at the Facility to document the dates and times that the sweepers are operated.  A sample blank log sheet will be included in the Facility's Annual Report and the SWPPP.

7.      **Monitoring**.  SGC agrees to perform the monitoring described herein during the 2009-2010 and 2010-2011 rainy seasons.

a.      SGC shall incorporate the discharges from the parking lot area into its storm water monitoring program.  The monitoring location for this area shall be called "SD-8".

b.      SGC shall sample and analyze storm water discharges at the following storm water discharge locations, marked on Exhibit A: SD-2, SD-3, SD-4, SD-6, and SD-8 [adjacent parking lot].  Monitoring samples shall be

4

collected at a point downstream from any storm water management measures and treatment systems.

c.      During the 2009-2010 rainy season, SGC shall sample and analyze storm water discharges from three (3) qualifying storm events that result in discharge consistent with the requirements and protocols set forth in the General Permit.  During the 2010-2011 rainy season, SGC shall sample and analyze storm water discharges from three (3) qualifying storm events that result in discharge consistent with the requirements and protocols set forth in the General Permit.

d.      SGC shall analyze each storm water sample taken in accordance with the General Permit and this Agreement for, at a minimum, total suspended solids, pH, oil and grease or total organic carbon, specific conductance, chemical oxygen demand, iron, zinc, copper, aluminum, and lead.

e.      SGC shall conduct monthly visual observations of its discharge location for at least one qualifying rain event per month that results in any discharge from the Facility.  SGC shall maintain a written log describing these observations.

f.      All maintenance, repair, and replacement activities relating to the Facility's storm water management program shall be recorded and described on appropriate log books or sheets.  Such logs shall include, but not be limited to, filter repairs and replacements.  Sample log sheets shall be included in the Facility's SWPPP.  Completed logs for each rainy season shall be included as part of the Facility's Annual Report submitted to the San Francisco Bay Regional Water Quality Control Board ("Regional Board").

8.    **Monitoring Results.**  Results from SGC's sampling and analysis during the term of this AGREEMENT shall be provided to CSPA within 30 days of receipt of the sampling results by SGC or its counsel.

9. **Meet and Confer Regarding Exceedence of Levels of Potential Concern.** If analytical results of storm water samples taken by SGC during the 2009-2010 and 2010-2011 rainy season indicate that storm water discharges from the Facility exceed the following levels of potential concern – Total Suspended Solids: 100 mg/L; Specific Conductance: 200 μmhos/cm; Oil & Grease: 15 mg/L or Total Organic Carbon: 120 mg/L; pH: 6.0-9.0 s.u.; Aluminum: 0.75 mg/L; Zinc: 0.117 mg/L; Iron: 1.0 mg/L; Copper: 0.0636 mg/L; Lead: 0.0816 mg/L; and Chemical Oxygen Demand: 120 mg/L – SGC agrees to take responsive actions to improve its storm water management practices, including re-evaluating its structural and non-structural BMPs and considering additional BMPs aimed at reducing levels observed in storm water samples.

In furtherance of that objective, SGC shall prepare a written statement ("Memorandum") discussing:

(1)  Any exceedance or exceedances;

(2)  An explanation of the possible cause(s) and/or source(s) of any exceedance; and

(3)  Responsive actions to improve its storm water management practices, including modified or additional feasible best management practices ("BMPs") to be considered to further reduce the possibility of future exceedance(s).

Such Memorandum shall be e-mailed and sent via first class mail to CSPA not later than July 15th (or at such date as may be mutually agreed upon) following the conclusion of each rainy season.

10.  Any additional measures set forth in the Memorandum shall be implemented as soon as practicable, but not later than twenty-one (21) days from the due date of the Memorandum, except where 1) structural changes require longer than twenty-one (21) days to complete; 2) weather-related conditions render immediate implementation infeasible; or 3) the SETTLING PARTIES agree in writing to defer implementation of specific measures in order to effectively meet and confer in accordance with Paragraph 11.  Within thirty (30) days of

6

implementation, SGC's SWPPP shall be amended to include all additional BMP measures designated in the Memorandum.

11.     Upon receipt of the Memorandum, CSPA may review and comment on any additional measures.  If requested by CSPA within twenty-one (21) days of receipt of such Memorandum, CSPA and SGC shall meet and confer and conduct a site inspection within sixty (60) days after the due date of the Memorandum to discuss the contents of the Memorandum and the adequacy of proposed measures to improve the quality of the Facility's storm water to levels at or below the Levels of Potential Concern.  If within twenty-one (21) days of the parties meeting and conferring, the parties do not agree on the adequacy of the additional measures set forth in the Memorandum, the SETTLING PARTIES may agree to seek a settlement conference with the Magistrate Judge assigned to this action pursuant to Paragraphs 25 and 26 below.  If the SETTLING PARTIES fail to reach agreement on additional measures, CSPA may bring a motion before the Magistrate Judge consistent with Paragraphs 25 and 26 below.  If CSPA does not request a meet and confer regarding the Memorandum within the twenty-one (21) day comment period provided for in this paragraph, CSPA shall waive any right to object to such Memorandum pursuant to this AGREEMENT.

12.     Any concurrence or failure to object by CSPA with regard to the reasonableness of any additional measures required by this AGREEMENT or implemented by SGC shall not be deemed to be an admission of the adequacy of such measures should they fail to bring the Facility's storm water into compliance with applicable water quality criteria.

13.     In addition to any site inspections conducted as part of meeting and conferring on additional measures set forth above, SGC shall permit representatives of CSPA to perform one (1) additional site visit to the Facility per year during normal daylight business hours during the term of this AGREEMENT; provided that CSPA provides SGC via e-mail with at least one week prior written notice.

14.     **Provision of Documents and Reports.**  During the life of this AGREEMENT, SGC shall provide CSPA with a copy of all documents submitted to the Regional Board or the State Water Resources Control Board ("State Board") concerning the Facility's storm water

7

SETTLEMENT AGREEMENT: California Sportfishing Protection Alliance v. Solano Garbage Company. –
Case No. 3:09-cv-00243-SI

discharges, including but not limited to all documents and reports submitted to the Regional Board and/or State Board as required by the General Permit. Such documents and reports shall be mailed to CSPA contemporaneously with submission to such agency. SGC also shall provide CSPA a copy of all documents referenced in this agreement, including but not limited to logs, photographs, or analyses, within seven (7) days of a written request (via e-mail or regular mail) by CSPA.

15.     **Amendment of SWPPP and SWMP.** Within sixty (60) days of the Effective Date of this AGREEMENT, SGC shall amend the Facility's SWPPP and the Facility's Storm Water Monitoring Plan ("SWMP") to incorporate all changes, improvements, sample log forms, and best management practices set forth in or resulting from this AGREEMENT. SGC shall ensure that all maps, tables, and text comply with the requirements of the General Permit. SGC shall ensure that the SWPPP describes all structural and non-structural BMPs, details the measures to be installed, and discusses why such BMPs will be effective in addressing the pollutant sources at the Facility. A copy of the amended SWPPP and SWMP shall be provided to CSPA within thirty (30) days of completion. Specific improvements to the Facility's map include the following: identification of the storm water discharge locations, a key describing the symbols on the map, indication of the direction of storm water flows/drainage areas, indication of where materials are directly exposed to precipitation, and location of any structural control measures.

16.     **MITIGATION PAYMENT**. In recognition of the good faith efforts by SGC to comply with all aspects of the General Permit and the Clean Water Act, and in lieu of payment by SGC of any penalties which have been disputed but could have been assessed in this action if it had adjudicated adverse to SGC, the SETTLING PARTIES agree that SGC will pay the sum of forty thousand dollars ($40,000) to the Rose Foundation for Communities and the Environment ("Rose Foundation") for the sole purpose of providing grants to environmentally beneficial projects in southern Solano County and the downstream watershed relating to water quality improvements in those areas, provided that the Rose Foundation agrees that it will not use or grant any funds provided by SGC to fund litigation against solid waste projects in Solano County. The SETTLING PARTIES agree to recommend to the Rose Foundation that some or all of the mitigation funds be directed to the one or more proposals for funding improvements to the

8

Solano Land Trust/Rush Ranch facility on Grizzly Island Road in the Suisun Primary Marsh if a suitable grant application is submitted to the Rose Foundation for that project. SGC shall prepare a letter to be jointly signed by the SETTLING PARTIES recommending said project. Payment shall be provided to the Rose Foundation as follows: Rose Foundation, 6008 College Avenue, Oakland, CA 94618, Attn: Tim Little. The Rose Foundation shall provide notice to the SETTLING PARTIES within thirty (30) days of when the funds are dispersed by the Rose Foundation, setting forth the recipient and purpose of the funds.

17. **Fees, Costs, and Expenses**. As reimbursement for CSPA's investigative, expert and attorneys' fees and costs, SGC shall pay CSPA the sum of forty-two thousand five hundred dollars ($42,500). Payment shall be made by SGC within fifteen (15) calendar days of the District Court's entry of the Order dismissing the action described in Paragraph 2 of this AGREEMENT. Payment by SGC to CSPA shall be made in the form of a single check payable to "Lozeau Drury LLP Attorney-Client Trust Account," and shall constitute full payment for all costs of litigation, including investigative, expert and attorneys' fees and costs incurred by CSPA that have or could have been claimed in connection with CSPA's claims, up to and including the Effective Date of this AGREEMENT.

18. **Compliance Oversight Costs**: As reimbursement for CSPA's future costs that will be incurred in order for CSPA to monitor SGC's compliance with this AGREEMENT and to effectively meet and confer and evaluate monitoring results for the Facility, SGC agrees to pay CSPA the amount of FIVE THOUSAND DOLLARS ($5,000) for costs to be incurred in overseeing the implementation of this Consent Decree. SGC shall make payment to CSPA within thirty (30) calendar days of the District Court's entry of the Order dismissing the action described in Paragraph 2 of this AGREEMENT. Payment by SGC to CSPA shall be made in the form of a check payable to "Lozeau Drury LLP Attorney-Client Trust Account."

19. **Review by Federal Agencies.** CSPA shall submit this AGREEMENT to the U.S. EPA and the U.S. Department of Justice (hereinafter, the "Agencies") via certified mail, return receipt requested, within five (5) days after the Effective Date of this AGREEMENT for review consistent with 40 C.F.R. § 135.5. The Agencies' review period expires forty-five (45) days after receipt of the AGREEMENT by both Agencies, as evidenced by the return receipts, copies

9

## NO ADMISSION OR FINDING

20.     Neither this AGREEMENT nor any payment pursuant to the AGREEMENT shall constitute evidence or be construed as a finding, adjudication, or acknowledgment of any fact, law or liability, nor shall it be construed as an admission of violation of any law, rule or regulation.  However, this AGREEMENT and/or any payment pursuant to the AGREEMENT may constitute evidence in actions seeking compliance with this AGREEMENT.

## MUTUAL RELEASE OF LIABILITY AND COVENANT NOT TO SUE

21.     In consideration of the above, and except as otherwise provided by this AGREEMENT, the SETTLING PARTIES hereby forever and fully release each other and their respective successors, assigns, officers, agents, employees, and all persons, firms and corporations having an interest in them, from any and all claims and demands of any kind, nature, or description whatsoever, and from any and all liabilities, damages, injuries, actions or causes of action, either at law or in equity, which the SETTLING PARTIES have against each other arising from CSPA's allegations and claims as set forth in the 60-Day Notice Letter and Complaint up to and including the Termination Date of this AGREEMENT.

22.     The SETTLING PARTIES acknowledge that they are familiar with section 1542 of the California Civil Code, which provides:

A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

10

SETTLEMENT AGREEMENT: California Sportfishing Protection Alliance v. Solano Garbage Company. – Case No. 3:09-cv-00243-SI

The SETTLING PARTIES hereby waive and relinquish any rights or benefits they may have under California Civil Code section 1542 with respect to any other claims against each other arising from, or related to, the allegations and claims as set forth in the 60-Day Notice Letter and Complaint up to and including the Termination Date of this AGREEMENT.

23.     For the period beginning on the Effective Date and ending on December 14, 2011, CSPA agrees that neither CSPA, its officers, executive staff, members of its governing board nor any organization under the control of CSPA, its officers, executive staff, or members of its governing board, will file any lawsuit against SGC seeking relief for alleged violations of the Clean Water Act or violations of the General Permit.  CSPA further agrees that, beginning on the Effective Date and ending on December 14, 2011, CSPA will not support other lawsuits, by providing financial assistance, personnel time or other affirmative actions, against SGC that may be proposed by other groups or individuals who would rely upon the citizen suit provision of the Clean Water Act to challenge SGC's compliance with the Clean Water Act or the General Permit.

## TERMINATION DATE OF AGREEMENT

24.     This AGREEMENT shall terminate on December 14, 2011.

## DISPUTE RESOLUTION PROCEDURES

25.     Except as specifically noted herein, any disputes with respect to any of the provisions of this AGREEMENT shall be resolved through the following procedure.  The SETTLING PARTIES agree to first meet and confer to resolve any dispute arising under this AGREEMENT.  In the event that such disputes cannot be resolved through this meet and confer process, the SETTLING PARTIES agree to request a settlement meeting before the Magistrate Judge assigned to this action.  In the event that the SETTLING PARTIES cannot resolve the dispute by the conclusion of the settlement meeting with the Magistrate Judge, the SETTLING PARTIES agree to submit the dispute via motion to the Magistrate Judge.

26.     In resolving any dispute arising from this AGREEMENT, the Judge shall have discretion to award attorneys' fees and costs to either party.  The relevant provisions of the then-

applicable Clean Water Act and Rule 11 of the Federal Rules of Civil Procedure shall govern the allocation of fees and costs in connection with the resolution of any disputes before the Magistrate Judge.  The Magistrate Judge shall award relief limited to compliance orders and awards of attorneys' fees and costs, subject to proof.  The SETTLING PARTIES agree to file any waivers necessary for the Magistrate Judge to preside over any settlement conference and motion practice.

## BREACH OF SETTLEMENT AGREEMENT

27.    **Impossibility of Performance.**  Where implementation of the actions set forth in this AGREEMENT, within the deadlines set forth in those paragraphs, becomes impossible, despite the timely good faith efforts of the SETTLING PARTIES, the party who is unable to comply shall notify the other in writing within seven (7) days of the date that the failure becomes apparent, and shall describe the reason for the non-performance.  The SETTLING PARTIES agree to meet and confer in good faith concerning the non-performance and, where the SETTLING PARTIES concur that the non-performance was or is impossible, despite the timely good faith efforts of one of the SETTLING PARTIES, new performance deadlines shall be established.  In the event that the SETTLING PARTIES cannot timely agree upon the terms of such a stipulation, either of the SETTLING PARTIES shall have the right to invoke the dispute resolution procedure described herein.

## GENERAL PROVISIONS

28.    **Construction.**  The language in all parts of this AGREEMENT shall be construed according to its plain and ordinary meaning, except as to those terms defined by law, in the General Permit, Clean Water Act or specifically herein.

29.    **Choice of Law.** This AGREEMENT shall be governed by the laws of the United States, and where applicable, the laws of the State of California.

30.    **Severability.**  In the event that any provision, section, or sentence of this AGREEMENT is held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

12

SETTLEMENT AGREEMENT: California Sportfishing Protection Alliance v. Solano Garbage Company. –
Case No. 3:09-cv-00243-SI

31.    **Correspondence.**  All notices required herein or any other correspondence pertaining to this AGREEMENT shall be sent by regular, certified, or overnight mail as follows:

If to CSPA:

Bill Jennings, Chairman
California Sportfishing Protection Alliance
3536 Rainier Road
Stockton, CA  95204
Tel: (209) 464-5067
deltakeep@aol.com

And to:

Michael R. Lozeau
Douglas J. Chermak
Lozeau Drury LLP
1516 Oak Street, Suite 216
Alameda, CA 94501
Tel:  (510) 749-9102
michael@lozeaudrury.com
doug@lozeaudrury.com

If to SGC:

General Manager
Solano Garbage Company
2901 Industrial Court
Fairfield, California 94533

And to:

Scott W. Gordon
Law Offices of Scott W. Gordon
1990 N. California Blvd., Suite 940
Walnut Creek, CA  94596
swgordon@sbcglobal.net

Notifications of communications shall be deemed submitted on the date that they are e-mailed, postmarked and sent by first-class mail or deposited with an overnight mail/delivery service.  Any change of address or addresses shall be communicated in the manner described above for giving notices.

32. **Counterparts.** This AGREEMENT may be executed in any number of counterparts, all of which together shall constitute one original document. Telecopied, scanned (.pdf), and/or facsimiled copies of original signature shall be deemed to be originally executed counterparts of this AGREEMENT.

33. **Assignment.** Subject only to the express restrictions contained in this AGREEMENT, all of the rights, duties and obligations contained in this AGREEMENT shall inure to the benefit of and be binding upon the SETTLING PARTIES, and their successors and assigns.

34. **Modification of the Agreement:** This AGREEMENT, and any provisions herein, may not be changed, waived, discharged or terminated unless by a written instrument, signed by the SETTLING PARTIES.

35. **Full Settlement.** This AGREEMENT constitutes a full and final settlement of this matter. It is expressly understood and agreed that the AGREEMENT has been freely and voluntarily entered into by the SETTLING PARTIES with and upon advice of counsel.

36. **Integration Clause.** This is an integrated AGREEMENT. This AGREEMENT is intended to be a full and complete statement of the terms of the agreement between the SETTLING PARTIES and expressly supersedes any and all prior oral or written agreements covenants, representations and warranties (express or implied) concerning the subject matter of this AGREEMENT.

37. **Authority.** The undersigned representatives for CSPA and SGC each certify that he/she is fully authorized by the party whom he/she represents to enter into the terms and conditions of this AGREEMENT.

The SETTLING PARTIES hereby enter into this AGREEMENT.

Date: _August 27_, 2009

SOLANO GARBAGE COMPANY

By: _Tim M. Center_
Title: _Vice President_

14

SETTLEMENT AGREEMENT: California Sportfishing Protection Alliance v. Solano Garbage Company. –
Case No. 3:09-cv-00243-SI

Date: 17 August, 2009

CALIFORNIA SPORTFISHING PROTECTION ALLIANCE

By: Bill Jennings
Title: Executive Director

**APPROVED AS TO FORM:**

Date: August 19, 2009

For DEFENDANT

LAW OFFICES OF SCOTT W. GORDON

By: Scott W. Gordon, Esq.

Date: 17 August, 2009

For PLAINTIFF

LOZEAU DRURY LLP

By: Douglas J. Chermak, Esq.

15

EXHIBIT A



GLASS RECYCLING
STORAGE AREA
(TYP OF 3)

DROP BOXES
ALU/TIN CAN
STORAGE
(TYP OF 3)

CORROSIVE & COMBUSTIBLE
WITH SECONDARY CONTAINMENT

INCOMING GLASS/ OIL
RECYCLING STAGING AREA

INDUSTRIAL COU

2901 INDUSTRIA

ADMIN
TRAILER

TRUCK PORT NO. 1

7

CONCRETE
WALL

4

3

RECYCLING
AREA

USED OIL   OIL/WAT
STORAGE    SEPERAT

EMPLOYEE PARKING

CARDBOARD
UNLOADING
AREA
(NO COVER)

RECYCLABLE MATERIALS
BLDG 3

WASTE OIL
STORAGE TANK
4000 GAL W/
DRAIN PLUG KIT

PAPER
& BAIL
STORAGE

HOUSEHOLD
HAZ. WASTE
COLLECTION AREA

ADMIN.
ROOM

FUELING
ISLAND

HAZ. WASTE
STORAGE

5

6

12' SS

12' SS

12" SS

2

TO McCOY
CREEK

42" STORM DRAIN

SCRAP META
STORAGE RA

CARDBOARD
STAGING
AREA

CONCRETE CULVERT
BAILED PAPER/CARDBOARD
STORAGE AREA

BAILED CANS STORAGE AREAA

N

LEGEND:

| | STORM DRAIN BOX |
|---|---|
| SS | SANITARY SEWER LINE |
| 1 | STORM DRAIN I.D. NO./MONITORING POINT |
| ← | DIRECTION OF SURFACE FLOW |

NOTE:  FOOTPRINT OF ENTIRE FACILITY IS PAVED.

| SD | STORM DRAIN LINE |
|---|---|
| O | SAMPLE LOCATION (TWO TOTAL) |

NOTES:

1:     SITE PLAN HAS BEEN UPDATED PER 2004 – 2005 ANNUAL E

2:     LANDSCAPE WATERING OCCURS IN THE EASEMENT LOCATED AL



VACANT LOTS

LANDSCAPE
WATERING

COURT

COVERED TRUCK PARKING

1

UNDERGROUND STORAGE
TANK

PAINT
BOOTH

DRIVERS
OIL ROOM

MAINTENANCE BUILDING
BLDG 2

DIESEL GENERATOR
(SPECTRUM 30)

TRUCK PARKING
BLDG 5

HAZ. WASTE
STORAGE
AREA

HAZ. MATERIALS
STORAGE
AREA

PAVED PARKING

SOLANO CO. MOSQUITO ABATEMENT DISTRICT

ADMINISTRATION
OFFICE, BLDG 1

VEHICLE WASH
AREA
TO SANITARY SEWER

WASTE WATER
RECYCLING UNIT/AREA

12" SS
CURB

12" SS

12" SS

FENCE

UNPAVED
EASEMENT 22'

AIR BASE PARKWAY

0        50        100 FT

..UATION REPORT.

G THE NORTH SIDE OF THE FACILITY.

| CAL ENVIRONMENTAL SERVICES INC VACAVILLE, CA 95688 707-448-7996 | JOB NUMBER: 3806 | DRAWN BY: B.HAMMER | DATE: 9/15/05 |
|---|---|---|---|
| | REVISION: 6/11/02 | CAD FILENAME: 3806FIG_1D | SCALE: 1"=50' |
| FACILITY SITE MAP SOLANO GARBAGE COMPANY FAIRFIELD, CALIFORNIA | | | DWG# FIG. 1D |

Case3:09-cv-00243-SI  Document22  Filed 08/28/09  Page21 of 56

# EXHIBIT B

Michael R. Lozeau (State Bar No. 142893)
Douglas J. Chermak (State Bar No. 233382)
LOZEAU DRURY LLP
1516 Oak Street, Suite 216
Alameda, CA 94501
Tel: (510) 749-9102
Fax: (510) 749-9103 (fax)
E-mail: michael@lozeaudrury.com
    doug@lozeaudrury.com

Andrew L. Packard (State Bar No. 168690)
LAW OFFICES OF ANDREW L. PACKARD
319 Pleasant Street
Petaluma, CA 94952
Tel: (707) 763-7227
Fax: (415) 763-9227
E-mail: andrew@packardlawoffices.com

Attorneys for Plaintiff
CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation,<br><br>    Plaintiff,<br><br>vs.<br><br>SOLANO GARBAGE COMPANY, a corporation.<br><br>    Defendant. | Case No. **C09-00243**<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, by and through its

counsel, hereby alleges:

## I.    INTRODUCTION

1.    This complaint seeks relief for Defendant's discharges of polluted storm water

and non-storm water pollutants from Defendant's facility ("the Facility") into the waters of

the United States in violation of the Act and the State of California's "Waste Discharge

COMPLAINT

1

Requirements (WDRs) For Discharges of Storm Water Associated With Industrial Activities Excluding Construction Activities," State Water Resources Control Board ("State Board") Water Quality Order No. 91-13-DWQ, as amended by Water Quality Order No. 92-12-DWQ and Water Quality Order No. 97-03-DWQ, National Pollutant Discharge Elimination System ("NPDES") Permit No. CAS000001, (hereinafter "the Order" or "Permit"). Defendant's violations of the discharge, treatment technology, monitoring requirements, and other procedural and substantive requirements of the Permit and the Act are ongoing and continuous.

2.      The failure on the part of persons and facilities such as Defendant and its industrial facility to comply with storm water requirements is recognized as a significant cause of the continuing decline in water quality of Grizzly Bay, Suisun Bay, San Francisco Bay ("Bay"), and other area receiving waters. The general consensus among regulatory agencies and water quality specialists is that storm pollution amounts to a substantial portion of the total pollution entering the aquatic environment each year. With every rainfall event, millions of gallons of polluted rainwater originating from industries within the surrounding area pour into the Bay.

3.      The continuing decline in water quality in the San Francisco Bay is a matter of serious public concern. The entire Bay and all of its major tributaries have been identified by the State Board, the Regional Water Quality Control Board of the San Francisco Bay Region ("Regional Board"), and Environmental Protection Agency ("EPA") as impaired water bodies under Section 303(d) of the Clean Water Act. 33 U.S.C. § 1313(d).

## II.      **JURISDICTION AND VENUE**

4.      This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq*. (the "Clean Water Act" or "the Act"). This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States). The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of

actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

5.     On or about November 7, 2008, Plaintiff provided notice of Defendant's violations of the Act, and of its intention to file suit against Defendant, to the Defendant; the Administrator of the United States EPA; the Administrator of EPA Region IX; the Executive Director of the State Board; and to the Executive Officer of the Regional Board.  A true and correct copy of CSPA's notice letter is attached as Exhibit A, and is incorporated by reference.

6.     More than sixty days have passed since notice was served on Defendant and the State and federal agencies.  Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint.  This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

7.     Venue is proper in the Northern District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.  Pursuant to Local Rule 3-2(c), intradistrict venue is proper in Oakland, California because the sources of the violations are located within Solano County, California.

## III.   PARTIES

8.     Plaintiff CALIFORNIA SPORTFISHING PROTECTION ALLIANCE ("CSPA") is a non-profit public benefit corporation organized under the laws of the State of California with its main office in Stockton, California.  CSPA has approximately 2,000 members who live, recreate and work in and around waters of the State of California, including Grizzly Bay, Suisun Bay, San Francisco Bay and their tributaries.  CSPA is dedicated to the preservation, protection, and defense of the environment, the wildlife and the natural resources of all waters of California.  To further these goals, CSPA actively seeks federal and state agency implementation of the Act and other laws and, where necessary,

COMPLAINT

3

1   directly initiates enforcement actions on behalf of itself and its members.

2        9.     Members of CSPA reside in and around the Bay and enjoy using the Bay for

3   recreation and other activities.  Members of CSPA use and enjoy the waters into which

4   Defendant has caused, is causing, and will continue to cause, pollutants to be discharged.

5   Members of CSPA use those areas to fish, sail, boat, kayak, swim, bird watch, view wildlife

6   and engage in scientific study including monitoring activities, among other things.

7   Defendant's discharges of pollutants threaten or impair each of those uses or contribute to

8   such threats and impairments.  Thus, the interests of CSPA's members have been, are being,

9   and will continue to be adversely affected by Defendant's failure to comply with the Clean

10  Water Act and the Permit.  The relief sought herein will redress the harms to Plaintiff caused

11  by Defendant's activities.

12       10.    Plaintiff is informed and believes, and thereupon alleges, that Defendant

13  SOLANO GARBAGE COMPANY (hereinafter "Defendant" or "Solano Garbage") is a

14  corporation organized under the laws of California.  Defendant Solano Garbage operates a

15  waste collection and recycling center in Fairfield, California.

16  **IV.**    **STATUTORY BACKGROUND**

17       11.    Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any

18  pollutant into waters of the United States, unless such discharge is in compliance with

19  various enumerated sections of the Act.  Among other things, Section 301(a) prohibits

20  discharges not authorized by, or in violation of, the terms of an NPDES permit issued

21  pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

22       12.    Section 402(p) of the Act establishes a framework for regulating municipal and

23  industrial storm water discharges under the NPDES program.  33 U.S.C. § 1342(p).  States

24  with approved NPDES permit programs are authorized by Section 402(p) to regulate

25  industrial storm water discharges through individual permits issued to dischargers or through

26  the issuance of a single, statewide general permit applicable to all industrial storm water

27  dischargers.  33 U.S.C. § 1342(p).

28       13.    Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the

COMPLAINT

4

U.S. EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

14. The State Board elected to issue a statewide general permit for industrial storm water discharges. The State Board issued the General Permit on or about November 19, 1991, modified the General Permit on or about September 17, 1992, and reissued the General Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

15. In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit. 33 U.S.C. § 1311(a).

16. The General Permit contains several prohibitions. Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. BAT and BCT include both nonstructural and structural measures. General Permit, Section A(8). Discharge Prohibition A(2) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance. Receiving Water Limitation C(1) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation C(2) of the General Permit prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

17. EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT. 65 Fed. Reg. 64746, 64767 (Oct. 30, 2000). EPA has established Parameter Benchmark Values for the following parameters, among others: total suspended solids – 100 mg/L; pH – 6.0-9.0 s.u.; lead – 0.0816 mg/L; copper – 0.0636 mg/L; chemical

COMPLAINT

oxygen demand – 120 mg/L; total organic carbon – 110 mg/L; aluminum – 0.75 mg/L; iron – 1.0 mg/L; and zinc – 0.117 mg/L.  The California State Water Resources Control Board has proposed a Benchmark Value for electrical conductance of 200 μmhos/cm.

18.     In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet.  Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent To Comply ("NOI").  The General Permit requires existing dischargers to have filed their NOIs before March 30, 1992.

19.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP").  The SWPPP must describe storm water control equipment and measures that comply with the BAT and BCT standards.  The General Permit requires that an initial SWPPP have been developed and implemented before October 1, 1992.  The SWPPP must, among other requirements, identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm and non-storm water discharges from the facility and identify and implement site-specific best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges (Section A(2)).  The SWPPP's BMPs must implement BAT and BCT (Section B(3)).  The SWPPP must include: a description of individuals and their responsibilities for developing and implementing the SWPPP (Section A(3)); a site map showing the facility boundaries, storm water drainage areas with flow pattern and nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, impervious areas, areas of actual and potential pollutant contact, and areas of industrial activity (Section A(4)); a list of significant materials handled and stored at the site (Section A(5)); a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities, and a description of significant spills and leaks, a list of all non-storm water discharges and their sources, and a description of locations where soil erosion may

occur (Section A(6)).  The SWPPP must include an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective (Section A(7), (8)). The SWPPP must be evaluated to ensure effectiveness and must be revised where necessary (Section A(9),(10)).

20.     Section C(11)(d) of the General Permit's Standard Provisions requires dischargers to report any noncompliance to the Regional Board.  *See also* Section E(6). Lastly, Section A(9) of the General Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities.

21.     The General Permit requires dischargers commencing industrial activities before October 1, 1992 to develop and implement an adequate written monitoring and reporting program no later than October 1, 1992.  Existing facilities covered under the General Permit had to implement all necessary revisions to their monitoring programs no later than August 1, 1997.

22.     As part of their monitoring program, dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.  Dischargers must conduct visual observations of these discharge locations for at least one storm per month during the wet season (October through May) and record their findings in their Annual Report.  Dischargers must also collect and analyze storm water samples from at least two storms per year.  Section B(5)(a) of the General Permit requires that dischargers "shall collect storm water samples during the first hour of discharge from (1) the first storm event of the wet season, and (2) at least one other storm event in the wet season. All storm water discharge locations shall be sampled."  Section B(5)(c)(i)-(iii) requires dischargers to sample

COMPLAINT

7

and analyze during the wet season for basic parameters, such as pH, total suspended solids ("TSS"), electrical conductance, and total organic carbon ("TOC") or oil and grease ("O&G"), certain industry-specific parameters, and toxic chemicals and other pollutants likely to be in the storm water discharged from the facility.  Dischargers must also conduct dry season visual observations to identify sources of non-storm water pollution.

23.     Section B(14) of the General Permit requires dischargers to submit an annual report by July 1 of each year to the executive officer of the relevant Regional Board.  The annual report must be signed and certified by an appropriate corporate officer.  Sections B(14), C(9), (10).  Section A(9)(d) of the General Permit requires the discharger to include in their annual report an evaluation of their storm water controls, including certifying compliance with the General Permit.  *See also* Sections C(9) and (10) and B(14).

24.     Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements.  33 U.S.C. §§1365(a)(1) and (f), § 1362(5).  An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a).  Violators of the Act are also subject to an assessment of civil penalties of up to $27,500 per day (violations from January 30, 1997 through March 15, 2004) and $32,500 per day (violations after March 15, 2004) pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365 and 40 C.F.R. §§ 19.1 - 19.4.

25.     The Regional Board has established water quality standards for the San Francisco Bay in the Water Quality Control Plan for the San Francisco Bay Basin, generally referred to as the Basin Plan.

26.     The Basin Plan provides that "[w]aters shall not contain suspended material in concentrations that cause nuisance or adversely affect beneficial uses."

27.     The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that are lethal or that produce other detrimental responses in aquatic organisms."

28.     The Basin Plan provides that "[w]aters shall not contain oils, greases, waxes,

or other materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or that otherwise adversely affect beneficial uses."

29.     The Basin Plan establishes a dissolved oxygen standard of 7.0 mg/L for waters upstream from the Carquinez Bridge.

30.     The Basin Plan establishes Marine Water Quality Objectives for zinc of 0.081 mg/L (4-day average) and 0.090 mg/L (1-hour average); copper of 0.0031 mg/L (4-day average) and 0.0048 mg/L (1-hour average); and lead of 0.0081 mg/L (4 day average) and 0.21 mg/L (1hour average).

31.     The Basin Plan establishes Freshwater Water Quality Objectives for zinc of 0.12 mg/L (4-day average and1-hour average); for copper of 0.009 mg/L (4-day average) and 0.013 mg/L (1-hour average); and lead of 0.0025 mg/L (4-day average) and 0.065 mg/L (1-hour average).  The Basin Plan establishes a water for aluminum of 0.2 mg/L (secondary maximum contaminant level).

32.     The EPA has adopted saltwater numeric water quality standards for copper of 0.0031 mg/L (Criteria Maximum Concentration – "CMC") and .0048 mg/L (Criteria Continuous Concentration – "CCC"), for lead of 0.210 mg/L (CMC) and 0.0081 mg/L (CCC), for zinc of 0.09 mg/L (CMC) and 0.081 mg/L (CCC).

33.     The EPA has adopted freshwater numeric water quality standards for copper of 0.013 mg/L (CMC) and 0.009 mg/L (CCC); for lead of 0.065 mg/L (CMC) and 0.0025 mg/L (CCC); and for zinc of 0.12 mg/L (CMC and CCC)

**V.     STATEMENT OF FACTS**

34.     Defendant Solano Garbage operates a waste collection and recycling center at 2901 Industrial Court in Fairfield, California.  The Facility is engaged in recycling operations as well as storing, processing, and trucking various waste materials.  The Facility falls within the Standard Industrial Classification ("SIC") Codes 5093 and 4212.  The Facility covers about 10 acres, the majority of which is paved and used for transporting and storing waste materials throughout the Facility.  On information and belief, Plaintiff alleges

9

that there are at least four buildings located on the property.  On information and belief, Plaintiff alleges that recycling and processing is conducted both inside and outside of these buildings.  Materials are transported in and out of these buildings for storage in the paved and unpaved areas of the Facility.

35.     Defendant channels and collects storm water falling on the Facility through seven storm water outfalls.  Each storm drain collects storm water runoff from a particular area of the Facility.  These outfalls discharge the storm water to the City of Fairfield storm drain system and/or to McCoy Creek, which empties into Suisun Slough, a tributary to Grizzly Bay and Suisun Bay.

36.     The industrial activities at the site include the storage, processing, and transfer of a variety of materials including construction material and debris, hazardous material, metal, organic material, oils, paint, paper, plastic, and other materials.  It includes recycling operations for materials such as paper, plastic, glass, wood/yard waste, scrap metal, tires, construction debris and other materials.  It includes the storage and maintenance of trucks, tractors, and other machinery used to transfer and dispose of these materials.  Materials handled at the Facility include motor oil, hydraulic oil, transmission oil, greases, used oil and oil filters, baled aluminum cans, baled paper, glass, paint, and solvents.

37.     Significant activities at the site take place outside and are exposed to rainfall. These activities include the storage and processing of the numerous types of materials handled by the Facility; the storage and use of vehicles and equipment for materials handling; and the storage, handling, and disposal of waste materials.  Loading and delivery of materials occurs both inside and outside.  Trucks enter and exit the Facility directly from and to a public road.  Plaintiff alleges on information and belief that trucks and forklifts are the primary means of moving materials around the unpaved storage areas of the Facility. Plaintiff is informed and believes, and thereupon alleges, that recycling and transfer activities also occur in exposed areas at the Facility.  The Facility's exposed areas contain large piles of a variety of materials.  Plaintiff alleges on information and belief that some of the exposed surfaces at the Facility are unpaved and sediment and other materials are disturbed as a result

COMPLAINT

10

of the recycling, storage, and transfer processes.  These areas are exposed to storm water and storm flows due to the lack of overhead coverage, berms and other storm water controls.

38.   Industrial machinery, heavy equipment and vehicles, including trucks and trailers are operated and stored at the Facility in areas exposed to storm water flows. Plaintiff is informed and believes, and thereupon alleges, that such machinery and equipment leak contaminants such as oil, grease, diesel fuel, anti-freeze and hydraulic fluids that are exposed to storm water flows and that such machinery and equipment track sediment and other contaminants throughout the Facility.

39.   Plaintiff is informed and believes, and thereupon alleges that the storm water flows easily over the surface of the Facility, collecting suspended sediment, dirt, oils, grease, and other pollutants as it flows toward the storm water drain.  Storm water and any pollutants contained in that storm water entering the drains flows directly to storm drains that flow directly to McCoy Creek and/or Suisun Slough, which flows into Grizzly Bay and Suisun Bay.

40.   The management practices at the Facility are wholly inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States.  The Facility lacks sufficient structural controls such as grading, berming, roofing, containment, or drainage structures to prevent rainfall and storm water flows from coming into contact with these and other exposed sources of contaminants.  The Facility lacks sufficient structural controls to prevent the discharge of water once contaminated.  The Facility lacks adequate storm water pollution treatment technologies to treat contaminated storm water prior to its flowing off of the Facility.

41.   Since at least December 27, 2004, Defendant has taken samples or arranged for samples to be taken of storm water discharges at the Facility.  The sample results were reported in the Facility's annual reports submitted to the Regional Board.  Defendant Solano Garbage certified each of those annual reports pursuant to Sections A and C of the General Permit.

42.   Since at least December 27, 2004, the Facility has detected aluminum, iron,

COMPLAINT
11

and zinc in storm water discharged from the Facility.  Since at least April 28, 2005, the Facility has detected TSS and electrical conductance in storm water discharged from the Facility.  Since at least November 2, 2006, the Facility has detected TOC in storm water discharged from the Facility.  Levels of these pollutants detected in the Facility's storm water have been in excess of EPA's numeric parameter benchmark values.  Levels of these pollutants detected in the Facility's storm water have been in excess of water quality standards established in the Basin Plan.

43.     The levels of total suspended solids in storm water detected by the Facility have exceeded the benchmark value for total suspended solids of 100 mg/L established by EPA.  For example, on December 6, 2007, the level of suspended solids measured by Defendant in the Facility's discharged storm water was 892 mg/L.  That level of total suspended solids is over eight times the benchmark value for suspended solids established by EPA.

44.     The levels of total organic carbon in storm water detected by the Facility have exceeded the benchmark value for total organic carbon of 110 mg/L established by EPA. For example, on November 2, 2006, the level of total organic carbon measured by Defendant in the Facility's discharged storm water was 312 mg/L.  That level of total organic carbon is nearly three times the benchmark value for total organic carbon established by EPA.

45.     The levels of iron in storm water detected by the Facility have exceeded the benchmark value for iron of 1.0 mg/L established by EPA.  For example, on December 6, 2007, the level of iron measured by Defendant in the Facility's discharged storm water was 5.2 mg/L.  That level of iron is over five times the benchmark value for iron established by EPA.

46.     The levels of zinc in storm water detected by the Facility have exceeded the benchmark value for zinc of 0.117 mg/L established by EPA.  For example, on March 26, 2007, the level of zinc measured by Defendant in the Facility's discharged storm water was 4.8 mg/L.  That level of zinc is over 41 times the benchmark value for zinc established by EPA.

COMPLAINT

47.     The levels of aluminum in storm water detected by the Facility have exceeded the benchmark value for aluminum of 0.75 mg/L established by EPA.  For example, on March 26, 2007, the level of aluminum measured by Defendant in the Facility's discharged storm water was 3.2 mg/L.  That level of aluminum is over four times the benchmark value for aluminum established by EPA.

48.     The electrical conductance levels detected by the Facility in its storm water have been greater than the benchmark value of 200 μmho/cm proposed by the State Board. For example, on November 2, 2006, the electrical conductance level measured by Defendant in the Facility's discharged storm water was 464 μmho/cm.  That electrical conductance level is more than twice times the State Board's proposed benchmark value.

49.     On information and belief, Plaintiff alleges that Defendants have failed to analyze its storm water samples for chemical oxygen demand as required by the Table D of the General Permit since at least December 27, 2004.

50.     On information and belief, Plaintiff alleges that Defendants have failed to analyze its storm water samples for copper as required by the Table D of the General Permit since at least November 2, 2006.

51.     On information and belief, Plaintiff alleges that Defendants have failed to analyze its storm water samples for lead as required by the Table D of the General Permit since at least November 2, 2006.

52.     On information and belief, Plaintiff alleges that since at least December 27, 2004, Defendant has failed to implement BAT and BCT at the Facility for its discharges of total suspended solids, total organic carbon, iron, zinc, aluminum, electrical conductance, and other pollutants.  The General Permit requires that Defendant implement BAT for toxic and nonconventional pollutants and BCT for conventional pollutants by no later than October 1, 1992.  As of the date of this Complaint, Defendant has failed to implement BAT and BCT.

53.     On information and belief, Plaintiff alleges that Defendant failed to submit an Annual Report to the Regional Board for the 2003-2004 rainy season.

COMPLAINT
13

54.     On information and belief, Plaintiff alleges that since at least November 21, 2003, Defendant has failed to implement an adequate SWPPP for the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for the Facility does not set forth site-specific best management practices for the Facility that are consistent with BAT or BCT for the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for the Facility does not include an assessment of potential pollutant sources, structural pollutant control measures employed by the Defendant, a list of actual and potential areas of pollutant contact, or a description of best management practices to be implemented at the Facility to reduce pollutant discharges.  According to information available to CSPA, Defendant's SWPPP has not been evaluated to ensure effectiveness and revised where necessary to further reduce pollutant discharges.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP does not include each of the mandatory elements required by Section A of the General Permit.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP does not contain an accurate map that clearly delineates the boundaries of the Facility, storm water drainage areas with flow pattern and nearby water bodies, the location of the storm water collection, conveyance and discharge systems, structural control measures, impervious areas, areas of actual and potential pollutant contact, and areas of industrial activity.

55.     Information available to CSPA indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the Facility directly to a channel that flows into McCoy Creek and Suisun Slough, which flows into Grizzly Bay and Suisun Bay.  Grizzly Bay and Suisun Bay are parts of San Francisco Bay.

56.     Plaintiff is informed and believes, and thereupon alleges, that pollutants discharged by the Facility in its storm water are contributing to violations of water quality standards that apply to McCoy Creek and the San Francisco Bay and its tributaries.  Plaintiff is informed and believes, and thereupon alleges, that Defendant is discharging total suspended solids, total organic carbon, iron, zinc, aluminum, electrical conductance, and other un-

COMPLAINT

14

monitored pollutants that are causing or contributing to exceedances of applicable water quality standards. Defendant is contributing to violations of water quality standards including, but not limited to, the narrative water quality standard for toxicity and the numeric water quality standard for electrical conductance.

57. Plaintiff is informed and believes, and thereupon alleges, that, Defendant has failed and continues to fail to alter the Facility's SWPPP and site-specific BMPs consistent with Section A(9) of the General Permit.

58. Plaintiff is informed and believes that Defendant failed to submit to the Regional Board a true and complete annual report certifying compliance with the General Permit since at least December 27, 2004. Pursuant to Sections A(9)(d), B(14), and C(9), (10) of the General Permit, Defendant must submit an annual report, that is signed and certified by the appropriate corporate officer, outlining the Facility's storm water controls and certifying compliance with the General Permit. Plaintiff is informed and believes, and thereupon alleges, that Defendant has signed incomplete annual reports that purported to comply with the General Permit when there was significant noncompliance at the Facility.

59. Information available to Plaintiff indicates that Defendant has not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of polluted storm water. Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuing.

## VI. <u>CLAIMS FOR RELIEF</u>

### <u>FIRST CAUSE OF ACTION</u>
**Failure to Develop and Implement the Best Available and
Best Conventional Treatment Technologies
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

60. Plaintiff realleges and incorporate Paragraphs 1-59, as if fully set forth herein.

61. The General Permit's SWPPP requirements and Effluent Limitation B(3) require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional

pollutants.  Defendant has failed to implement BAT and BCT at the Facility for its discharges of total suspended solids, total organic carbon, iron, zinc, aluminum, electrical conductance, and other un-monitored pollutants in violation of Effluent Limitation B(3) of the General Permit.

62.     Each day since November 21, 2003 that Defendant has failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

63.     Defendant has been in violation of the BAT/BCT requirements every day since November 21, 2003.  Defendant continues to be in violation of the BAT/BCT requirements each day that it fails to develop and fully implement an adequate BAT/BCT for the Facility.

### SECOND CAUSE OF ACTION
**Failure to Prepare, Implement, Review, and Update
an Adequate Storm Water Pollution Prevention Plan
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

64.     Plaintiff realleges and incorporate Paragraphs 1-63, as if fully set forth herein.

65.     Section A and Provision E of the General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing an adequate SWPPP no later than October 1, 1992.

66.     Defendant has failed to develop and implement an adequate SWPPP for the Facility.  Defendant's ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, *inter alia*, Defendant's outdoor storage of various materials, without appropriate best management practices; the continued exposure of significant quantities of various materials to storm water flows; the continued exposure and tracking of waste resulting from the operation or maintenance of vehicles at the site; the failure to either treat storm water prior to discharge or to implement effective containment practices; and the continued discharge of storm water pollutants from the Facility at levels in excess of EPA benchmark values.

67.     Defendant has failed to update the Facility's SWPPP in response to the analytical results of the Facility's storm water monitoring.

COMPLAINT

16

68.     Each day since November 21, 2003 that Defendant has failed to develop, implement and update an adequate SWPPP for the Facility is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

69.     Defendant has been in violation of the SWPPP requirements every day since November 21, 2003.  Defendant continues to be in violation of the SWPPP requirements each day that it fails to develop and fully implement an adequate SWPPP for the Facility.

### THIRD CAUSE OF ACTION
**Failure to Develop and Implement an Adequate Monitoring and Reporting Program**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

70.     Plaintiff re-alleges and incorporates Paragraphs 1-69, inclusive, as if fully set forth herein.

71.     Section B of the General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including, *inter alia*, sampling and analysis of discharges) no later than October 1, 1992.

72.     Defendant has failed to develop and implement an adequate monitoring and reporting program for the Facility.  Defendant's ongoing failure to develop and implement an adequate monitoring and reporting program are evidenced by, *inter alia*, their failure to monitor storm water discharges for chemical oxygen demand, lead, and copper.

73.     Each day since November 21, 2003 that Defendant has failed to develop and implement an adequate monitoring and reporting program for the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

### FOURTH CAUSE OF ACTION
**Discharges of Contaminated Storm Water**
**in Violation of Permit Conditions and the Act**
**(Violations of 33 U.S.C. §§ 1311(a), 1342)**

74.     Plaintiff re-alleges and incorporates Paragraphs 1-73, inclusive, as if fully set forth herein.

COMPLAINT

17

75.     Discharge Prohibition A(2) of the General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitations C(1) and C(2) of the General Permit require that storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

76.     Plaintiff is informed and believes, and thereupon alleges, that since at least November 21, 2003, Defendant has been discharging polluted storm water from the Facility directly to channels or storm drains that flow into the Suisun Bay and the San Francisco Bay, in violation of the Discharge Prohibition A(2) of  the General Permit.

77.     During every rain event, rainwater flows freely over exposed materials, waste products, and other accumulated pollutants at the Facility, becoming contaminated with these pollutants. The rainwater then flows untreated from the Facility into a channel or storm drain. This contaminated storm water flows into Suisun Bay, a part of the San Francisco Bay.

78.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing pollution and contamination of the waters of the United States in violation of Discharge Prohibition A(2) of the General Permit.

79.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitation C(1) of the General Permit.

80.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitation C(2) of the General Permit.

81.     Every day since at least November 21, 2003, that Defendant has discharged and continues to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These

COMPLAINT

18

1  violations are ongoing and continuous.

2  ### FIFTH CAUSE OF ACTION
   **Failure to Submit Annual Report and False Certification of Compliance In Annual**
3  **Report**
   **(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**
4
5  82.    Plaintiff realleges and incorporate Paragraphs 1-81, as if fully set forth herein.

6  83.    Defendant has falsely certified compliance with the General Permit in each of

   the annual reports submitted to the Regional Board since at least June 2004.
7
8  84.    Plaintiff is informed and believes, and thereupon alleges that Defendant failed

9  to submit an Annual Report to the Regional Board for the 2003-2004 rainy season.

10 85.    Each day since at least June 30, 2004 that Defendant has falsely certified

11 compliance with the General Permit is a separate and distinct violation of the General Permit

12 and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendant continues to be in violation of

13 the General Permit's certification requirement each day that it maintains its false certification

   of its compliance with the General Permit.
14
15 ## VII.   RELIEF REQUESTED

16     Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

17     a.   Declare Defendant to have violated and to be in violation of the Act as

   alleged herein;
18
19     b.   Enjoin Defendant from discharging polluted storm water from the Facility

20 unless authorized by the Permit;

21     c.   Enjoin Defendant from further violating the substantive and procedural

   requirements of the Permit;
22
23     d.   Order Defendant to immediately implement storm water pollution control

24 and treatment technologies and measures that are equivalent to BAT or BCT and prevent

25 pollutants in the Facility's storm water from contributing to violations of any water quality

   standards;
26
27     e.   Order Defendant to comply with the Permit's monitoring and reporting

28 requirements, including ordering supplemental monitoring to compensate for past monitoring

COMPLAINT

1 violations;

2       f.  Order Defendant to prepare a SWPPP consistent with the Permit's

3 requirements and implement procedures to regularly review and update the SWPPP;

4       g.  Order Defendant to provide Plaintiff with reports documenting the quality

5 and quantity of their discharges to waters of the United States and their efforts to comply with

6 the Act and the Court's orders;

7       h.  Order Defendant to pay civil penalties of $27,500 per day per violation for

8 all violations occurring before March 15, 2004, and $32,500 per day per violation for all

9 violations occurring after August 28, 2002, for each violation of the Act pursuant to Sections

10 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

11       i.  Order Defendant to take appropriate actions to restore the quality of waters

12 impaired or adversely affected by their activities;

13       j.  Award Plaintiff's costs (including reasonable investigative, attorney, witness,

14 compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

15       k.  Award any such other and further relief as this Court may deem appropriate.

16

17 Dated: January 20, 2009       Respectfully submitted,

18                       LOZEAU DRURY LLP

19

20                       By:

21                       Douglas J. Chermak
                      Attorney for Plaintiff

22                       CALIFORNIA SPORTFISHING PROTECTION
                      ALLIANCE

23

24

25

26

27

28

# EXHIBIT A

## California Sportfishing Protection Alliance

*"An Advocate for Fisheries, Habitat and Water Quality"*
3536 Rainier Avenue, Stockton, CA 95204
Tel: 209-464-5067, Fax: 209-464-1028, E: deltakeep@aol.com

VIA CERTIFIED MAIL
RETURN RECEIPT REQUESTED

October 30, 2008

Joe Della Zoppa, Executive Vice President
Barbara Hansen, Safety Manager
Solano Garbage Company
2901 Industrial Court, P.O. Box B
Fairfield, CA  94533

Re:    **Notice of Violations and Intent to File Suit Under the Federal Water
       Pollution Control Act**

Dear Mr. Zoppa:

I am writing on behalf of the California Sportfishing Protection Alliance ("CSPA") in regard to violations of the Clean Water Act ("Act") that CSPA believes are occurring at the Solano Garbage Company facility ("Facility") located at 2901 Industrial Court in Fairfield, California.  CSPA is a non-profit public benefit corporation dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of the San Francisco Bay and other California waters.  This letter is being sent to you as the responsible owner, officer, or operator of the Facility (all recipients are hereinafter collectively referred to as "Solano Garbage").

This letter addresses Solano Garbage's unlawful discharge of pollutants from the Facility into the City of Fairfield storm drain system, Suisun Slough, and Suisun Bay.  The Facility is discharging storm water pursuant to National Pollutant Discharge Elimination System ("NPDES") Permit No. CA S000001, California Regional Water Quality Control Board, San Francisco Bay Region ("Regional Board") Order No. 92-12-DWQ as amended by Order No. 97-03-DWQ (hereinafter "General Permit").  The WDID identification number for the Facility listed on documents submitted to the Regional Board is 2481002528.  The Facility is engaged in ongoing violations of the substantive and procedural requirements of the General Permit.

Section 505(b) of the Clean Water Act requires a citizen to give notice of intent to file suit sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Act (33 U.S.C. § 1365(a)).  Notice must be given to the alleged violator, the U.S. Environmental Protection Agency, and the State in which the violations occur.

As required by the Clean Water Act, this Notice of Violation and Intent to File Suit provides notice of the violations that have occurred, and continue to occur, at the Facility.

Joe Della Zoppa
Barbara Hansen
Solano Garbage Company
October 30, 2008
Page 2 of 15

Consequently, Solano Garbage is hereby placed on formal notice by CSPA that, after the expiration of sixty days from the date of this Notice of Violation and Intent to Sue, CSPA intends to file suit in federal court against Solano Garbage, Joe Della Zoppa, and Barbara Hansen under Section 505(a) of the Clean Water Act (33 U.S.C. § 1365(a)), for violations of the Clean Water Act and the Order.  These violations are described more extensively below.

## I.    Background.

On May 6, 1997, Solano Garbage Company filed its Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI").  Solano Garbage certifies that the Facility is classified under SIC codes 5093 ("processing of scrap material") and 4212 ("local trucking without storage").  The Facility collects and discharges storm water from its 10-acre industrial site into at least seven storm water discharge locations at the Facility.  Based on information and belief, the storm water discharged by Solana Garbage is discharged to the City of Fairfield storm drain system, which empties into Suisun Slough, and flows to Suisun Bay.  The Regional Board has identified waters of Suisun Bay as failing to meet applicable water quality standards for PCBs, selenium, nickel, exotic species, dioxins, pesticides, and mercury.  *See* http://www.waterboards.ca.gov/tmdl/docs/303dlists2006/final/r2_final303dlist.pdf.

The Regional Board has identified beneficial uses of the Bay region's waters and established water quality standards for the Suisun Bay in the "Water Quality Control Plan for the San Francisco Bay Basin**,**" generally referred to as the Basin Plan.  *See* http://www.waterboards. ca.gov/sanfranciscobay/water_issues/programs/basin_plan/docs/basin_plan07.pdf.  The beneficial uses of these waters include among others contact and non-contact recreation, fish migration, endangered and threatened species habitat, shellfish harvesting, and fish spawning. The non-contact recreation use is defined as "[u]ses of water for recreational activities involving proximity to water, but not normally involving contact with water where water ingestion is reasonably possible. These uses include, but are not limited to, picnicking, sunbathing, hiking, beachcombing, camping, boating, tide pool and marine life study, hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities.  Water quality considerations relevant to non-contact water recreation, such as hiking, camping, or boating, and those activities related to tide pool or other nature studies require protection of habitats and aesthetic features." *Id.* at 2.1.16.  Visible pollution, including visible sheens and cloudy or muddy water from industrial areas, impairs people's use of the Bay for contact and non-contact water recreation.

The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that are lethal or that produce other detrimental responses in aquatic organisms."  *Id.* at 3.3.18.  The Basin Plan includes a narrative oil and grease standard which states that "[w]aters shall not contain oils, greases, waxes, or other materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or otherwise adversely affect beneficial uses."  *Id.* at

Joe Della Zoppa
Barbara Hansen
Solano Garbage Company
October 30, 2008
Page 3 of 15

3.3.7.  The Basin Plan provides that "[w]aters shall not contain suspended material in concentrations that cause nuisance or adversely affect beneficial uses." *Id.* at 3.3.14.  The Basin Plan provides a dissolved oxygen objective of 7.0 mg/L for waters upstream of the Carquinez Bridge.  The Basin Plan establishes Marine Water Quality Objectives for zinc of 0.081 mg/L (4-day average) and 0.090 mg/L (1-hour average); copper of 0.0031 mg/L (4-day average) and 0.0048 mg/L (1-hour average); and lead of 0.0081 mg/L (4 day average) and 0.21 mg/L (1hour average). *Id.* at Table 3-3.  EPA has adopted numeric water quality standards for copper of .0031 mg/L (4-day average) and .0048 mg/L (1-hour average), for lead of .210 mg/L (4-day average) and .0081 mg/L (1-hour average), and for zinc of .090 mg/L (4-day average) and .081 mg/L (1-hour average).  65 Fed.Reg. 31712 (May 18, 2000).

The U.S. Environmental Protection Agency ("EPA") has published benchmark levels as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite best available technology economically achievable ("BAT") and best conventional pollutant control technology ("BCT").  The following benchmarks have been established for pollutants discharged by Solano Garbage: pH – 6.0-9.0 units; total suspended solids ("TSS") – 100 mg/L, total organic carbon ("TOC") – 110 mg/L, chemical oxygen demand ("COD") – 120 mg/L, aluminum – 0.75 mg/L, zinc – 0.117 mg/L, iron – 1.0 mg/L, copper – 0.0636 mg/L, lead – 0.0816 mg/L.  The State Water Quality Control Board also has proposed adding a benchmark level to the General Permit for specific conductance (200 μmho/cm).

## II.    Alleged Violations of the NPDES Permit.

### A.    *Discharges in Violation of the Permit.*

Solano Garbage has violated and continues to violate the terms and conditions of the General Industrial Storm Water Permit.  Section 402(p) of the Act prohibits the discharge of storm water associated with industrial activities, except as permitted under an NPDES permit (33 U.S.C. § 1342) such as the General Permit.  The General Permit prohibits any discharges of storm water associated with industrial activities or authorized non-storm water discharges that have not been subjected to BAT or BCT.  Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  BAT and BCT include both nonstructural and structural measures.  General Permit, Section A(8).  Conventional pollutants are TSS, O&G, pH, biochemical oxygen demand ("BOD"), and fecal coliform.  40 C.F.R. § 401.16.  All other pollutants are either toxic or nonconventional.  *Id.*; 40 C.F.R. § 401.15.

In addition, Discharge Prohibition A(1) of the General Permit prohibits the discharge of materials other than storm water (defined as non-storm water discharges) that discharge either directly or indirectly to waters of the United States.  Discharge Prohibition A(2) of the General

Notice of Violation and Intent to File Suit

Joe Della Zoppa
Barbara Hansen
Solano Garbage Company
October 30, 2008
Page 4 of 15

Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

Receiving Water Limitation C(1) of the General Industrial Storm Water Permit prohibits storm water discharges and authorized non-storm water discharges to surface or groundwater that adversely impact human health or the environment.  Receiving Water Limitation C(2) of the General Permit also prohibits storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

Solano Garbage has discharged and continues to discharge storm water with unacceptable levels of TSS, specific conductivity, TOC, aluminum, iron, zinc, and other pollutants in violation of the General Permit.  Solano Garbage's sampling and analysis results reported to the Regional Board confirm discharges of specific pollutants and materials other than storm water in violation of the Permit provisions listed above.  Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation."  *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

The following discharges of pollutants from the Facility have violated Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) and are evidence of ongoing violations of Effluent Limitation B(3) of the General Industrial Storm Water Permit.

| Date | Parameter | Observed Concentration | Benchmark Value | Location (as identified by the Facility) |
|------|-----------|------------------------|-----------------|------------------------------------------|
| 12/6/2007 | Total Suspended Solids | 115 mg/L | 100 mg/L | SD-2 |
| 12/6/2007 | Aluminum | 1.4 mg/L | 0.75 mg/L | SD-2 |
| 12/6/2007 | Iron | 2 mg/L | 1.0 mg/L | SD-2 |
| 12/6/2007 | Zinc | 0.23 mg/L | 0.117 mg/L | SD-2 |
| 12/6/2007 | Total Suspended Solids | 892 mg/L | 100 mg/L | SD-4 |
| 12/6/2007 | Specific Conductivity | 225 µmho/cm | 200 µmho/cm (proposed) | SD-4 |
| 12/6/2007 | Total Organic Carbon | 157 mg/L | 110 mg/L | SD-4 |
| 12/6/2007 | Aluminum | 2.3 mg/L | 0.75 mg/L | SD-4 |
| 12/6/2007 | Iron | 5.2 mg/L | 1.0 mg/L | SD-4 |
| 12/6/2007 | Zinc | 0.99 mg/L | 0.117 mg/L | SD-4 |
| 3/26/2007 | Total Suspended Solids | 184 mg/L | 100 mg/L | SD-2 |
| 3/26/2007 | Aluminum | 1.6 mg/L | 0.75 mg/L | SD-2 |
| 3/26/2007 | Iron | 2.4 mg/L | 1.0 mg/L | SD-2 |
| 3/26/2007 | Zinc | 0.53 mg/L | 0.117 mg/L | SD-2 |
| 11/2/2006 | Total Suspended Solids | 438 mg/L | 100 mg/L | SD-2 |
| 11/2/2006 | Aluminum | 2.0 mg/L | 0.75 mg/L | SD-2 |

Notice of Violation and Intent to File Suit

Joe Della Zoppa
Barbara Hansen
Solano Garbage Company
October 30, 2008
Page 5 of 15

| 11/2/2006 | Iron | 3.7 mg/L | 1.0 mg/L | SD-2 |
|---|---|---|---|---|
| 11/2/2006 | Zinc | 0.52 mg/L | 0.117 mg/L | SD-2 |
| 11/2/2006 | Total Suspended Solids | 580 mg/L | 100 mg/L | SD-4 |
| 11/2/2006 | Specific Conductivity | 464 µmho/cm | 200 µmho/cm (proposed) | SD-4 |
| 11/2/2006 | Total Organic Carbon | 312 mg/L | 110 mg/L | SD-4 |
| 11/2/2006 | Aluminum | 2.3 mg/L | 0.75 mg/L | SD-4 |
| 11/2/2006 | Iron | 6 mg/L | 1.0 mg/L | SD-4 |
| 11/2/2006 | Zinc | 1.2 mg/L | 0.117 mg/L | SD-4 |
| 4/28/2005 | Aluminum | 1.9 mg/L | 0.75 mg/L | SD-2 |
| 4/28/2005 | Iron | 2.6 mg/L | 1.0 mg/L | SD-2 |
| 4/28/2005 | Zinc | 0.19 mg/L | 0.117 mg/L | SD-2 |
| 4/28/2005 | Total Suspended Solids | 297 mg/L | 100 mg/L | SD-4 |
| 4/28/2005 | Specific Conductivity | 263 µmho/cm | 200 µmho/cm (proposed) | SD-4 |
| 4/28/2005 | Aluminum | 6.6 mg/L | 0.75 mg/L | SD-4 |
| 4/28/2005 | Iron | 12.9 mg/L | 1.0 mg/L | SD-4 |
| 4/28/2005 | Zinc | 0.55 mg/L | 0.117 mg/L | SD-4 |
| 12/27/2004 | Aluminum | 1.7 mg/L | 0.75 mg/L | SD-4 |
| 12/27/2004 | Iron | 2.9 mg/L | 1.0 mg/L | SD-4 |
| 12/27/2004 | Zinc | 0.18 mg/L | 0.117 mg/L | SD-4 |

CSPA's investigation, including its review of Solano Garbage's analytical results documenting pollutant levels in the Facility's storm water discharges well in excess of applicable water quality standards, EPA's benchmark values and the State Board's proposed benchmark for electrical conductivity, indicates that Solano Garbage has not implemented BAT and BCT at the Facility for its discharges of TSS, specific conductivity, TOC, aluminum, iron, zinc, and other pollutants, in violation of Effluent Limitation B(3) of the General Permit.

On information and belief, CSPA asserts that the results for Solano Garbage's storm water samples for the 2003-2004 rainy season contain pollutant levels that are in excess of the EPA's benchmark values and the State Board's proposed benchmarks for TSS, specific conductivity, TOC, aluminum, iron, zinc, and other pollutants.  CSPA was unable to review a copy of Solano Garbage's 2003-2004 Annual Report for Storm Water Discharges, because a copy of the report does not exist in the file for Solano Garbage at the Regional Board office.  (A copy of Solano Garbage's 2004-2005 Annual Report was also not at the Regional Board office, but CSPA obtained the data for that year from a table attached to the 2007-2008 Annual Report.) Excesses during the 2003-2004 rainy season would be consistent with the excesses observed in

Joe Della Zoppa
Barbara Hansen
Solano Garbage Company
October 30, 2008
Page 6 of 15

the storm water sampling results for all other rainy seasons at Solano Garbage during the past five years.[*]

Solano Garbage was required to have implemented BAT and BCT by no later than October 1, 1992.  Thus, Solano Garbage is discharging polluted storm water associated with its industrial operations without having implemented BAT and BCT.  In addition, the above numbers indicate that the facility is discharging polluted storm water in violation of Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the General Permit.  CSPA alleges that such violations also have occurred and will occur on other rain dates, including every significant rain event that has occurred since October 30, 2003, and that will occur at the Facility subsequent to the date of this Notice of Violation and Intent to File Suit.  Attachment A, attached hereto, sets forth each of the specific rain dates on which CSPA alleges that Solano Garbage has discharged storm water containing impermissible levels of TSS, specific conductivity, TOC, aluminum, iron, and zinc in violation of Effluent Limitation B(3), Discharge Prohibitions A(1) and A(2), and Receiving Water Limitations C(1) and C(2) of the General Permit.

These unlawful discharges from the Facility are ongoing.  Each discharge of storm water containing any of these pollutants constitutes a separate violation of the General Industrial Storm Water Permit and the Act.  Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Solano Garbage is subject to penalties for violations of the General Permit and the Act since October 30, 2003.

### B.        *Failure to Sample and Analyze for Mandatory Parameters*

With some limited adjustments, facilities covered by the General Permit must sample two storm events per season from each of their storm water discharge locations.  General Permit, Section B(5)(a).  Collected samples must be analyzed for TSS, pH, specific conductance, and either TOC or O&G.  *Id.* at Section B(5)(c)(i).  Facilities also must analyze their storm water samples for "[t]oxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities.  *Id.* at Section B(5)(c)(ii).  Certain SIC Codes also must analyze for additional specified parameters.  *Id.* at Section B(5)(c)(iii); *id.*, Table D.  Facilities within SIC Code 5093, including Solano Garbage, must analyze each of its storm water samples for COD, iron, lead, zinc, copper, and aluminum.  *Id.*, Table D (Sector N).  CSPA's review of Solano Garbage's monitoring data indicates that you have failed to analyze for the following required parameters in samples taken on the following dates at the identified storm water discharge locations at the Facility:

---

[*] Alternatively, to the extent Solano Garbage failed to file an annual report for the 2003-2004 rainy season by July 1, 2004, then the facility is in violation of Section B(14) of the General Permit, requiring the submission of an annual report by July 1st for the previous rainy season.

Joe Della Zoppa
Barbara Hansen
Solano Garbage Company
October 30, 2008
Page 7 of 15

| Date | Parameter | Benchmark | Location |
|------|-----------|-----------|----------|
| 12/6/2007 | COD | 120 mg/L | SD-2 |
| 12/6/2007 | COD | 120 mg/L | SD-4 |
| 3/26/2007 | COD | 120 mg/L | SD-2 |
| 3/26/2007 | COD | 120 mg/L | SD-4 |
| 3/26/2007 | Lead | 0.0816 mg/L | SD-2 |
| 3/26/2007 | Copper | 0.0636 mg/L | SD-2 |
| 3/26/2007 | Lead | 0.0816 mg/L | SD-4 |
| 3/26/2007 | Copper | 0.0636 mg/L | SD-4 |
| 11/2/2006 | Lead | 0.0816 mg/L | SD-2 |
| 11/2/2006 | Copper | 0.0636 mg/L | SD-2 |
| 11/2/2006 | Lead | 0.0816 mg/L | SD-4 |
| 11/2/2006 | Copper | 0.0636 mg/L | SD-4 |
| 11/2/2006 | COD | 120 mg/L | SD-2 |
| 11/2/2006 | COD | 120 mg/L | SD-4 |
| 3/20/2006 | COD | 120 mg/L | SD-2 |
| 3/20/2006 | COD | 120 mg/L | SD-4 |
| 4/28/2005 | COD | 120 mg/L | SD-2 |
| 4/28/2005 | COD | 120 mg/L | SD-4 |
| 12/27/2004 | COD | 120 mg/L | SD-2 |
| 12/27/2004 | COD | 120 mg/L | SD-4 |

On information and belief, CSPA asserts that the results for Solano Garbage's storm water samples for the 2003-2004 rainy season also did not contain analysis for COD, which would be consistent with the failures to analyze observed in the storm water sampling results for subsequent years.

Each of the above listed failures to analyze for specific required parameters is a violation of General Permit, Section B(5)(c)(iii). These violations are ongoing. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Solano Garbage is subject to penalties for violations of the General Permit and the Act since October 30, 2003.

C.    **Failure to Prepare, Implement, Review and Update an Adequate Storm Water Pollution Prevention Plan.**

Section A and Provision E(2) of the General Industrial Storm Water Permit require dischargers of storm water associated with industrial activity to develop, implement, and update an adequate storm water pollution prevention plan ("SWPPP") no later than October 1, 1992. Section A(1) and Provision E(2) requires dischargers who submitted an NOI pursuant to the General Permit to continue following their existing SWPPP and implement any necessary

Joe Della Zoppa
Barbara Hansen
Solano Garbage Company
October 30, 2008
Page 8 of 15

revisions to their SWPPP in a timely manner, but in any case, no later than August 1, 1997.

The SWPPP must, among other requirements, identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm and non-storm water discharges from the facility and identify and implement site-specific best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges (General Permit, Section A(2)). The SWPPP must include BMPs that achieve BAT and BCT (Effluent Limitation B(3)). The SWPPP must include: a description of individuals and their responsibilities for developing and implementing the SWPPP (General Permit, Section A(3)); a site map showing the facility boundaries, storm water drainage areas with flow pattern and nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, impervious areas, areas of actual and potential pollutant contact, and areas of industrial activity (General Permit, Section A(4)); a list of significant materials handled and stored at the site (General Permit, Section A(5)); a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities, a description of significant spills and leaks, a list of all non-storm water discharges and their sources, and a description of locations where soil erosion may occur (General Permit, Section A(6)).

The SWPPP also must include an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective (General Permit, Section A(7), (8)). The SWPPP must be evaluated to ensure effectiveness and must be revised where necessary (General Permit, Section A(9),(10)).

CSPA's investigation of the conditions at the Facility as well as Solano Garbage's Annual Reports indicate that Solano Garbage has been operating with an inadequately developed or implemented SWPPP in violation of the requirements set forth above. Solano Garbage has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary. Solano Garbage has been in continuous violation of Section A and Provision E(2) of the General Permit every day since October 30, 2003 at the very latest, and will continue to be in violation every day that Solano Garbage fails to prepare, implement, review, and update an effective SWPPP. Solano Garbage is subject to penalties for violations of the Order and the Act occurring since October 30, 2003.

### D.     Failure to Develop and Implement an Adequate Monitoring and Reporting Program

Section B of the General Permit describes the monitoring requirements for storm water and non-storm water discharges. Facilities are required to make monthly visual observations of storm water discharges (Section B(4)) and quarterly visual observations of both unauthorized

Joe Della Zoppa
Barbara Hansen
Solano Garbage Company
October 30, 2008
Page 9 of 15

and authorized non-storm water discharges (Section B(3)). Section B(5) requires facility operators to sample and analyze at least two storm water discharges from all storm water discharge locations during each wet season. Section B(7) requires that the visual observations and samples must represent the "quality and quantity of the facility's storm water discharges from the storm event."

The above referenced data was obtained from the Facility's monitoring program as reported in its Annual Reports submitted to the Regional Board. This data is evidence that the Facility has violated various Discharge Prohibitions, Receiving Water Limitations, and Effluent Limitations in the General Permit. To the extent the storm water data collected by Solano Garbage is not representative of the quality of the Facility's various storm water discharges, CSPA, on information and belief, alleges that the Facility's monitoring program violates Sections B(3), (4), (5) and (7) of the General Permit. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Solano Garbage is subject to penalties for violations of the General Permit and the Act's monitoring and sampling requirements since October 30, 2003.

### E.    *Failure to File True and Correct Annual Reports.*

Section B(14) of the General Industrial Storm Water Permit requires dischargers to submit an Annual Report by July 1st of each year to the executive officer of the relevant Regional Board. The Annual Report must be signed and certified by an appropriate corporate officer. General Permit, Sections B(14), C(9), (10). Section A(9)(d) of the General Industrial Storm Water Permit requires the discharger to include in their annual report an evaluation of their storm water controls, including certifying compliance with the General Industrial Storm Water Permit. *See also* General Permit, Sections C(9) and (10) and B(14).

 For the last five years, Solano Garbage and its agent, Barbara Hansen, inaccurately certified in their Annual Reports that the facility was in compliance with the General Permit. Consequently, Solano Garbage has violated Sections A(9)(d), B(14) and C(9) & (10) of the General Industrial Storm Water Permit every time Solano Garbage failed to submit a complete or correct report and every time Solano Garbage or its agents falsely purported to comply with the Act. Solano Garbage is subject to penalties for violations of Section (C) of the General Industrial Storm Water Permit and the Act occurring since October 30, 2003.

## IV.    Persons Responsible for the Violations.

CSPA puts Solano Garbage Company, Joe Zoppa, and Barbara Hansen on notice that they are the persons responsible for the violations described above. If additional persons are subsequently identified as also being responsible for the violations set forth above, CSPA puts Solano Garbage Company, Joe Zoppa, and Barbara Hansen on notice that it intends to include those persons in this action.

Joe Della Zoppa
Barbara Hansen
Solano Garbage Company
October 30, 2008
Page 10 of 15


**V.      Name and Address of Noticing Party.**

Our name, address and telephone number is as follows:

Bill Jennings, Executive Director;
California Sportfishing Protection Alliance,
3536 Rainier Avenue,
Stockton, CA 95204
Tel. (209) 464-5067

**VI.     Counsel.**

CSPA has retained legal counsel to represent it in this matter.  Please direct all communications to:

Michael R. Lozeau
Douglas Chermak                          Andrew L. Packard
Lozeau Drury LLP                         Law Offices of Andrew L. Packard
1516 Oak Street, Suite 216               319 Pleasant Street
Alameda, California 94501                Petaluma, California 94952
Tel. (510) 749-9102                      Tel. (707) 763-7227
mrlozeau@lozeaulaw.com                   andrew@packardlawoffices.com

**VII.    Penalties.**

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the Act subjects Solano Garbage to a penalty of up to $32,500 per day per violation for all violations occurring during the period commencing five years prior to the date of this Notice of Violations and Intent to File Suit.  In addition to civil penalties, CSPA will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law.  Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)), permits prevailing parties to recover costs and fees, including attorneys' fees.

CSPA believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit.  We intend to file a citizen suit under Section 505(a) of the Act against Solano Garbage and its agents for the above-referenced violations upon the expiration of the 60-day notice period.  However, during the 60-day notice period, we would be willing to discuss effective remedies for the violations noted in this letter.  If you wish to pursue such discussions in the absence of litigation, we suggest that you initiate those discussions within the next 20 days so that they may be completed before the end of the 60-day notice period.  We do not intend to

Joe Della Zoppa
Barbara Hansen
Solano Garbage Company
October 30, 2008
Page 11 of 15

delay the filing of a complaint in federal court if discussions are continuing when that period ends.

Sincerely,

Bill Jennings, Executive Director
California Sportfishing Protection Alliance


cc:     CT Corporation, Agent of Service of Process for Solano Garbage Company (C0902377)

## SERVICE LIST

Steve Johnson, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Dorothy R. Rice, Executive Director
State Water Resources Control Board
1001 I Street Sacramento, CA 95814
P.O. Box 100
Sacramento, CA 95812-0100

Michael Mukasey, U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Wayne Nastri, Administrator
U.S. EPA – Region 9
75 Hawthorne Street
San Francisco, CA, 94105

Bruce H. Wolfe, Executive Officer II
San Francisco Bay Regional Water Quality Control Board
1515 Clay Street, Suite 1400
Oakland, CA 94612

**ATTACHMENT A**

Rain Dates, Solano Garbage, Fairfield, California

| | | |
|---|---|---|
| November 3, 2003 | February 22, 2004 | January 26, 2005 |
| November 4, 2003 | February 23, 2004 | January 28, 2005 |
| November 7, 2003 | February 24, 2004 | February 14, 2005 |
| November 8, 2003 | February 25, 2004 | February 15, 2005 |
| November 9, 2003 | February 26, 2004 | February 16, 2005 |
| November 14, 2003 | March 1, 2004 | February 17, 2005 |
| November 15, 2003 | March 2, 2004 | February 18, 2005 |
| November 28, 2003 | March 25, 2004 | February 19, 2005 |
| November 30, 2003 | March 26, 2004 | February 20, 2005 |
| December 1, 2003 | April 17, 2004 | February 21, 2005 |
| December 2, 2003 | April 18, 2004 | February 22, 2005 |
| December 4, 2003 | April 19, 2004 | February 27, 2005 |
| December 5, 2003 | April 20, 2004 | February 28, 2005 |
| December 6, 2003 | September 19, 2004 | March 2, 2005 |
| December 7, 2003 | September 20, 2004 | March 4, 2005 |
| December 8, 2003 | October 17, 2004 | March 18, 2005 |
| December 9, 2003 | October 19, 2004 | March 19, 2005 |
| December 10, 2003 | October 20, 2004 | March 20, 2005 |
| December 12, 2003 | October 23, 2004 | March 21, 2005 |
| December 13, 2003 | October 24, 2004 | March 22, 2005 |
| December 14, 2003 | October 26, 2004 | March 23, 2005 |
| December 19, 2003 | November 3, 2004 | March 27, 2005 |
| December 20, 2003 | November 4, 2004 | March 28, 2005 |
| December 21, 2003 | November 10, 2004 | March 29, 2005 |
| December 23, 2003 | November 11, 2004 | April 3, 2005 |
| December 24, 2003 | November 12, 2004 | April 4, 2005 |
| December 25, 2003 | November 13, 2004 | April 7, 2005 |
| December 29, 2003 | November 27, 2004 | April 8, 2005 |
| December 30, 2003 | December 7, 2004 | April 23, 2005 |
| January 1, 2004 | December 8, 2004 | April 28, 2005 |
| January 2, 2004 | December 9, 2004 | May 4, 2005 |
| January 7, 2004 | December 27, 2004 | May 5, 2005 |
| January 8, 2004 | December 28, 2004 | May 8, 2005 |
| January 9, 2004 | December 29, 2004 | May 9, 2005 |
| January 10, 2004 | December 30, 2004 | May 10, 2005 |
| January 14, 2004 | December 31, 2004 | May 18, 2005 |
| January 17, 2004 | January 1, 2005 | June 8, 2005 |
| January 24, 2004 | January 2, 2005 | June 9, 2005 |
| January 27, 2004 | January 3, 2005 | June 16, 2005 |
| January 28, 2004 | January 4, 2005 | June 17, 2005 |
| January 30, 2004 | January 6, 2005 | October 26, 2005 |
| February 2, 2004 | January 7, 2005 | October 29, 2005 |
| February 3, 2004 | January 8, 2005 | November 7, 2005 |
| February 7, 2004 | January 9, 2005 | November 8, 2005 |
| February 14, 2004 | January 10, 2005 | November 25, 2005 |
| February 16, 2004 | January 11, 2005 | November 28, 2005 |
| February 17, 2004 | January 12, 2005 | November 29, 2005 |
| February 18, 2004 | January 21, 2005 | December 1, 2005 |
| February 21, 2004 | January 25, 2005 | December 2, 2005 |

Notice of Violation and Intent to File Suit

## ATTACHMENT A
Rain Dates, Solano Garbage, Fairfield, California

| | | |
|---|---|---|
| December 7, 2005 | March 24, 2006 | February 26, 2007 |
| December 17, 2005 | March 25, 2006 | February 27, 2007 |
| December 18, 2005 | March 27, 2006 | February 28, 2007 |
| December 19, 2005 | March 28, 2006 | March 26, 2007 |
| December 20, 2005 | March 29, 2006 | April 11, 2007 |
| December 21, 2005 | March 31, 2006 | April 14, 2007 |
| December 22, 2005 | April 1, 2006 | April 15, 2007 |
| December 23, 2005 | April 2, 2006 | April 21, 2007 |
| December 25, 2005 | April 3, 2006 | April 22, 2007 |
| December 26, 2005 | April 4, 2006 | April 23, 2007 |
| December 27, 2005 | April 5, 2006 | May 2, 2007 |
| December 28, 2005 | April 7, 2006 | May 4, 2007 |
| December 29, 2005 | April 8, 2006 | July 18, 2007 |
| December 30, 2005 | April 11, 2006 | September 21, 2007 |
| December 31, 2005 | April 12, 2006 | October 10, 2007 |
| January 1, 2006 | April 13, 2006 | October 12, 2007 |
| January 2, 2006 | April 15, 2006 | October 16, 2007 |
| January 3, 2006 | April 16, 2006 | November 10, 2007 |
| January 4, 2006 | April 17, 2006 | November 11, 2007 |
| January 7, 2006 | April 23, 2006 | December 4, 2007 |
| January 11, 2006 | May 20, 2006 | December 6, 2007 |
| January 14, 2006 | May 21, 2006 | December 7, 2007 |
| January 18, 2006 | May 22, 2006 | December 17, 2007 |
| January 21, 2006 | October 5, 2006 | December 18, 2007 |
| January 27, 2006 | November 2, 2006 | December 19, 2007 |
| January 28, 2006 | November 11, 2006 | December 20, 2007 |
| January 30, 2006 | November 13, 2006 | December 28, 2007 |
| February 1, 2006 | November 14, 2006 | December 29, 2007 |
| February 2, 2006 | November 26, 2006 | December 30, 2007 |
| February 4, 2006 | November 27, 2006 | January 3, 2008 |
| February 17, 2006 | December 9, 2006 | January 4, 2008 |
| February 18, 2006 | December 10, 2006 | January 5, 2008 |
| February 19, 2006 | December 11, 2006 | January 6, 2008 |
| February 26, 2006 | December 12, 2006 | January 8, 2008 |
| February 27, 2006 | December 13, 2006 | January 9, 2008 |
| February 28, 2006 | December 22, 2006 | January 10, 2008 |
| March 2, 2006 | December 24, 2006 | January 11, 2008 |
| March 3, 2006 | December 26, 2006 | January 20, 2008 |
| March 5, 2006 | December 27, 2006 | January 21, 2008 |
| March 6, 2006 | January 17, 2007 | January 22, 2008 |
| March 7, 2006 | January 27, 2007 | January 23, 2008 |
| March 9, 2006 | February 7, 2007 | January 24, 2008 |
| March 11, 2006 | February 8, 2007 | January 25, 2008 |
| March 12, 2006 | February 9, 2007 | January 26, 2008 |
| March 13, 2006 | February 10, 2007 | January 27, 2008 |
| March 14, 2006 | February 11, 2007 | January 28, 2008 |
| March 16, 2006 | February 12, 2007 | January 29, 2008 |
| March 17, 2006 | February 22, 2007 | January 31, 2008 |
| March 20, 2006 | February 23, 2007 | February 1, 2008 |
| March 21, 2006 | February 25, 2007 | February 2, 2008 |

## ATTACHMENT A
Rain Dates, Solano Garbage, Fairfield, California

| | | |
|---|---|---|
| February 3, 2008 | February 21, 2008 | March 16, 2008 |
| February 19, 2008 | February 23, 2008 | April 23, 2008 |
| February 20, 2008 | February 24, 2008 | |